## BAXTER v. WOLFE.

1. A devise to the testator's children for life with contingent remainder to their children, a trustee being appointed "to hold the legal title during the estate for life and for the preservation of the remainder," does not clothe the trustee with legal title to the remainder, but only with such title to the particular estate. The remainder created is a legal, not an equitable, estate.

2. Where, upon a petition of the trustee reciting that it was brought in behalf of petitioner as trustee of the life-tenants, the judge of the superior court granted an order authorizing the trustee to encumber the land by mortgage for the purpose of raising money to pay off indebtedness incurred by the trustee for the support of the tenants for life, a mortgage executed in pursuance of such order did not bind the interest in the land of an unborn contingent remainderman, nor did a sale under the mortgage defeat or in any manner affect his title.

3. Authority given by will to the widow as executrix to keep the estate together for the support and maintenance of the testator's

family during her widowhood, gave her no power to continue this arrangement after her intermarriage with another husband, the will directing that the estate be divided at the termination of her widowhood. Moreover, her letters testamentary abated upon her marriage and she was no longer executrix.

4. The evidence taken as a whole was sufficient to establish title in the plaintiff as against the defendant, and there was no error in directing a verdict accordingly.          *Judgment affirmed.*

January 27, 1894.

Ejectment. Before Judge GAMBLE. Bibb superior court. April term, 1893.

Mrs. Wolfe (by a former marriage Mrs. Freeman) sued Baxter to recover lot No. 8 in the 4th district of Bibb county, part of the lands known as the land of the Robert Freeman estate, and sometimes as the Fulton land, and part of the place known formerly as the William Scott mill-place; and as sole heir of James Freeman deceased, her only child by and the only child of the former husband, James S. Freeman deceased, for an undivided interest in said lot. After introduction of testimony for plaintiff, defendant introducing no testimony, it was agreed that the judge should direct a verdict as he might determine under the testimony submitted; and he directed a verdict for the plaintiff for one sixth undivided interest in the lot.

The evidence shows the following: Lot No. 8 was in possession of Robert Freeman in 1855 or 1856; after his death his widow, Harriet B. Freeman, remained in possession and control of it fifteen or twenty years. He left the following children: Charles, Elinora, James, Rebecca and Roberta, of whom the daughters are still living, unmarried, but the sons are dead. Lot No. 8 was not all of the tract, but there were about twenty lots all in a body. Mrs. Freeman was in possession of this body when in 1864 she married Fulton, who lived only a year or two, and after that she controlled the land as executrix (witness thought) and farmed on it.

There were houses and a grist-mill on it. The lot in dispute is a wild land lot, but a part of the same body. William Scott (the father of Mrs. Freeman, afterwards Fulton) had two other daughters, Mrs. Baxter and Mrs. Hamilton. He had a son named William Byrom Scott, who lived across the creek, the Freeman land being on "this" side of the creek. Lot No. 8 is on the other side of the creek, about a mile from the old Scott mill, but not more than a half-mile from the creek below the mill in a straight line. It was a part of his plantation, which was on both sides of the creek. It was a part of the Scott place, and was a wood lot. Witness never saw Robert Freeman in possession of this lot, and never saw him thereon. There was no fence around it, and it never was fenced that witness knew of, and was never cleared or cultivated. The only way he knew it was a part of the Robert Freeman place was, that it was included in the Freeman possessions; just knew it from the fact "they" have had possession of it. Did not know that Robert Freeman was in possession of it, but understood he owned it. Was about nine years old when Freeman died, and lived about three quarters of a mile from the lot. Never saw Freeman cut wood on it, and did not know about the time Freeman died that there was such a lot. Did not know the number of it then, but is now familiar with it. Did not know whether Freeman owned the land as his own, or claimed possession of it as executor of William Scott. Saw Mrs. Fulton managing the place, but never saw her do anything with regard to possession of this lot; never saw her cut wood off of it or have it cut; never had it fenced and never saw her on the lot. She had no one living on it, and was living in Baltimore. She died eight or ten years before the trial. He saw Sanders and Jones getting wood from the lot; and these were the only acts of ownership he had ever seen on that lot by anybody.

There were two acres in one corner that were cultivated fifteen or twenty years ago by Braswell. This was during Mrs. Freeman's ownership. Some of the other lands were cultivated. Numbers 7, 9, 32 and 46 were cultivated at the time of Freeman's death. There was a saw-mill on the place down the creek when Robert Freeman died. When witness first knew the saw-mill Byrom Scott was in possession, and after that Robert Freeman, and after his death his wife was in possession of it. Logs were cut promiscuously about on the land, but he did not know whether any were cut on lot No. 8. Timber was cut before and after the mill was burned in 1865.. Witness did not know anything of the timber being cut; only saw the stumps. Freeman at his death was in possession of the Barfield homestead on lot No. 8. Plaintiff's first husband was James S. Freeman, who died September 17th, 1886, leaving one child by her; the child died in August, 1887, leaving no heir but plaintiff. There is a small clearing on lot No. 8. Amason is in possession of it, as the agent of Baxter who put him in possession. The little clearing on the lot is known as the Barfield settlement, and a house was built on it. As far back as witness could remember (who was 52 years old at the time of the trial), Barfield used to live on the clearing, and after Barfield, William Scott was in possession of it, and after Byrom Scott was in possession Mrs. Freeman (that is Mrs. Fulton) was in possession and did the renting of it. A short while before Robert Freeman died, about 1855 or 1856, Byrom Scott was in possession (witness thought) attending to the business for his sister, Mrs. Freeman, about a year after Robert Freeman died. Witness never saw Byrom do anything on the lot; never saw him on the lot, and could not state any act of ownership he did with regard to it; he had charge of the interest, whatever it was, after Freeman died, representing Mrs. Freeman. He

v 93-22

had hands cutting on it after he was in possession of it, and witness saw his negroes on it. Barfield owned twenty acres of it in the northeast corner, and the balance was wild without improvements. The timber was cut south of where the house was. Since witness knew the lot and the Barfield clearing on it, several people have lived on it, among them Bartlett who was the last man Mrs. Freeman rented to; but witness did not know from whom the tenants got possession. Bartlett rented on the Freeman place about eleven years, moving there in 1878, and subrenting from Heard when he first went there, after that from Benson and after that from Mrs. Fulton. Those from whom he subrented were tenants of Mrs. Fulton, who was in possession of the whole plantation, lot number 8 being nearly in the center of it. The land included the mill, and as far back as Bartlett, who was 44 years old, could remember, it was called the Freeman land. When he first knew it, Mrs. Freeman, afterwards Mrs. Fulton, was in possession of it and during and after the war she was in possession, but he never heard her say how she held it. He never rented lot No. 8 from Mrs. Fulton, but only rented the Barfield settlement on lot No. 8. The lot lay out for several years. Mrs. Freeman rented it out when it was rented out, simply renting the open part of the cleared land. Bartlett had seen her on the lot at his house, and when she was there she was there to rent him the land. When Herring lived in the house during the war, he attended to Mrs. Freeman's business.—The following documents were in evidence: The will of Robert Freeman, which provided that all testator's estate, except such as might be sold to pay his debts, be kept together and managed by his executors for the support and maintenance of his family and education of his children, during the life and widowhood of his wife; that if his wife should marry, the estate should be equally divided between her and

children, this provision being made for his wife in lieu of dower; that if she should continue in widowhood, at her death the estate should be equally divided between the children share and share alike, and in case of a division on either of the events above stated, children of deceased children should stand in the place of the deceased parent; that in the event of such distribution during the minority of any of the children, J. C. Freeman should act as their testamentary guardian; that the property given to the children should be in trust for their use respectively during life, and at their death respectively the remainder to their children, children of decedents to stand in the place of deceased children; that should any of the testator's children die without leaving issue at the time of their death, the legacy to such children should lapse; that J. C. Freeman should be trustee to hold the legal title during the estate for life and for the preservation of the remainder; and that the property given to his wife on the event of her marriage, was given for her sole and separate use during her life, to be disposed of at her death in such manner as she might by deed or will direct. Comer was appointed executor, and testator's wife executrix. She alone qualified. The will was probated in 1855. In October, 1864, by petition to the judge of the superior court, Fulton set up that he had married the widow of Freeman, who at his death left a wife and five children, among them James Freeman, all of whom were minors; that in his will, attached to the petition, Robert Freeman devised his whole estate to his wife and children, but the shares of the children were given to them in trust during their respective lives for their sole use and after their respective deaths to their children, share and share alike; that James C. Freeman was appointed testamentary guardian, but declined to accept the trust; that the property was liable to waste, and that the chil-

dren desired that petitioner should be appointed testamentary guardian and trustee. A guardian *ad litem* was appointed, and in November, 1864, the court appointed Fulton trustee for the property and guardian for the minor children. In 1866 Mrs. Fulton brought her petition to the judge of the superior court entertaining jurisdiction in chancery, in which she referred to the will of Freeman, and to the fact that J. C. Freeman had been appointed trustee, and declined to accept the trust, and that Fulton was appointed trustee and guardian and continued to act until his death in August, 1866. She prayed for an order appointing her trustee for the children, stating that there was no occasion for the appointment of a guardian, the property not being divided. An order was passed by the judge, making the appointment thus prayed for. In 1870 Mrs. Fulton brought her petition to the judge of the superior court entertaining jurisdiction in chancery, in behalf of herself as trustee for her children Charles and Elinora, who were twenty-one years of age, and James, Rebecca and Roberta, who were minors. Petitioner alleged, she held in her own right and as trustee upwards of seventy-seven hundred acres of land, lot No. 8 with others, which were about all the property left her and children after the close of the war; that they resided there, cultivating a portion of the land for several years, but because of the disastrous seasons made small crops and were unable to meet expenses; that they were unable to pay off debts contracted for subsistence, some of which were in judgment partly against petitioner as trustee and partly against her individually, which had been levied on the lands; that the lands constituted one large body, with a valuable mill-site and a saw-mill and grist-mill, and were well adapted for carrying on an extensive manufacturing, milling and agricultural business under a common direction; that she could not sell a part of

them without making a great sacrifice, and was advised that it would be to the advantage of herself and children if she could manage to hold them a year or so longer, within which time it was thought probable they would be able to sell the whole body advantageously; that her relative and friend Baxter, desirous of freeing the land from judgment and her and the children from debts, had offered to loan them for this purpose $5,000, provided she would give her note individually and as such trustee therefor, and secure the same by a mortgage in his favor on the lands, after being duly authorized to execute the mortgage and note. She prayed for an order authorizing her as such trustee to execute the note and mortgage for said purposes, and, as far as the same might be needed, to use the balance, if any, in supplying the wants of her family and on the plantation, if deemed advisable; also, for a guardian *ad litem* to represent the minor children. This petition was signed by Mrs. Fulton and by Elinora and Charles Freeman; and at chambers in 1870, a guardian *ad litem* was appointed, who the same day answered that he had considered the statements in the petition and believed they were true, and recommended that the prayer therein be granted. On the same day at chambers the judge passed an order reciting, that having examined and considered the petition, it was ordered that the prayer of petitioner be granted, petitioner signing the note and mortgage as trustee and individually, and using the money when received as designated, and that she report her actings and doings at the next term of the court, and that these proceedings be entered on the minutes; all of which was done. Plaintiff introduced the mortgage executed in pursuance of the above order; and the mortgage *fi. fa.* in favor of Baxter against Mrs. Fulton, individually and as trustee for her children, levied on the property in March, 1877. In September, 1877, the same was sold by the

sheriff to Baxter, who held possession under this sale. Plaintiff also introduced, as an admission, two pleas filed by Baxter in another case pending against him, involving the title to lot 32, part of this same body of land; one of these pleas alleging that about 1870 he made a loan to Mrs. Fulton as trustee, under the will of Robert Freeman, of the minor children entitled under the will, and in her own right, to the amount of $5,000, in pursuance of an order of the judge of the superior court of Bibb county as chancellor, and in accordance with said order took a mortgage upon lot 32 with other lands; that the proceedings before the chancellor were in good faith; that the sum of $4,500 was still due on the mortgage debt: that the mortgage was duly foreclosed, execution issued thereon, and the property was sold, defendant being the purchaser at the sale and going into possession of the land then and there. The other plea alleged, that defendant claimed the land in controversy by virtue of the mortgage executed in 1870 by Mrs. Fulton; that he is entitled, in equity at least, to the ownership of five sixths of the property, inasmuch as he advanced $5,000 to the beneficiaries who claimed to be the owners thereof, for Mrs. Fulton and her five children, all of whom went before the judge, and under his direction and order, the same being at their request, executed the mortgage under which Baxter claimed title.

DESSAU & HODGES, TRACY BAXTER, W. H. FELTON, Jr., and JOHN L. HARDEMAN, for plaintiff in error.

STEED & WIMBERLY, FRANK A. ARNOLD and ALEXANDER & TURNBULL, *contra*.